VERMONT & M. R. CO. (WHITE v.). See Case No. 17,559.

VERMONT CENT. R. CO. (BROOKS v.). See Case No. 1,964.

VERMONT CENT. R. CO. (VERMONT & C. R. CO. v.). See Case No. 16,918.

VERMONT VAL. R. CO. (POND v.). See Cases Nos. 11.264 and 11.265.

---

## Case No. 16,921.

### VERNARD v. HUDSON.

[3 Sumn. 405.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1838.

BILL OF LADING—PRESUMPTIONS AS TO STOWAGE— STOWAGE ON DECK—FREIGHT.

1. Where goods are shipped under the common bill of lading, it is presumed, that they are shipped to be put under deck, as the ordinary mode of stowing cargo; unless there is a positive agreement to the contrary, or circumstances from which this may be inferred.

[Cited in The Waldo, Case No. 17,056. Quoted in The Wellington, Id. 17,384; 260 Hogsheads of Molasses, Id. 14,296.]

[1] [Reported by Charles Sumner, Esq.]

2. Where goods were shipped under the common bill of lading, at an under-deck freight, but were carried on deck, and finally delivered without damage, held, that the ship-owner was entitled only to a deck freight.

This was the case of an appeal from the decree of the district court [of the United States for the district of] Massachusetts, rendered in a suit in admiralty, brought to recover the freight due on a bill of lading of thirty hogsheads of bacon, shipped on board of the schooner Rolla, belonging to the libellant [Henry T. Vernard], at New Orleans, in April, 1838, to be transported on board of the said schooner to Boston, and there to be delivered (the dangers of the seas only excepted) to the respondent, Sumner Hudson, or to his assigns; he or they paying freight for the said goods eight dollars per hogshead, with five per cent. primage and average accustomed. The bill of lading was in the common form, specifying the goods to be "thirty hogsheads bacon," signed by the master, but with the further written statement, "contents unknown." The schooner arrived at Boston, and there delivered to the consignee. It appeared from the evidence, that the freight to be paid was the common under-deck freight, and that the hogsheads were actually brought on deck—the ordinary freight of goods so brought varies 5-8ths from the under-deck freight. The defence set up in the answer was in substance, that the contract was, that the goods should be carried under deck; that damage had occurred to the goods by reason of their exposure on the deck on the passage; that one hogshead was lost or stolen on the passage; and that on the remainder, even if there were no damage, the only freight which could become due and payable, would be the common deck freight; and that the respondents, at the time of the receipt of the goods, protested against the conduct of the master in bringing the goods on deck, and gave notice, that he should hold the owners responsible for damages. Upon the hearing in the district court, a decree was entered for the libellant for full freight and primage, amounting to $243.60, deducting therefrom the loss of the one hogshead, amounting to $80, and also the damage to thirteen hogsheads, amounting to $65, and costs. [Case unreported.] From this decree the present appeal was taken.

B. Rand, for libellant.

B. R. Curtis, for respondent.

STORY, Circuit Justice. It is admitted, on all sides, that the libellant is bound to pay for the loss of the one hogshead. That, therefore, does not enter into the controversy upon the present appeal. The questions here made are, first, whether there was any contract between the agent of the respondent (very fitly called at the bar the libellee), and the master of the Rolla, that the goods should and might be brought on deck; secondly, whether any damage occurred from their being carried on deck; and, thirdly, to what freight the libellant is en-

titled, whether to the under-deck freight, or to the deck freight only, if there has been no damage.

As to the first point, I take it to be very clear,· that where goods are shipped under the common bill of lading, it is presumed, that they are shipped to be put under deck, as the ordinary mode of stowing cargo. This presumption may be rebutted by showing a positive agreement between the parties that the goods are to be carried on deck; or it may be deduced from other circumstances, such, for example, as the goods paying the deck freight only. The admission of proof to this effect is perfectly consistent with the rules of law; for it neither contradicts nor varies any thing contained in the bill of lading; but it simply rebuts a presumption arising from the ordinary course of business. The onus probandi is, therefore, on the libellant to establish such an agreement. Now, although one witness has sworn to such an agreement, he is contradicted directly by as positive denials on the part of the agent, who shipped the goods for the libellee. And then, again, in support of the latter, there is the clear fact, that a full under-deck freight is stipulated for in the bill of lading, a fact certainly not easily reconcilable with the supposition, that they were to be carried on deck. So that the preponderance of the evidence decidedly is, that there was no such agreement to carry the goods on deck. If it had existed, one of two things ought to have occurred, either that the mere deck freight should have been payable; or that there should have been some written memorandum on the bill of lading, to repel the inference from a full freight being stipulated for.

As to the question of damages, my opinion is, that the evidence is not clear and determinate, that there has been any damage by carrying the goods on deck, for which the libellant is answerable. The onus probandi is on the libellee to establish the damage; for here in the bill of lading the words are written, "contents unknown;" and as the contents were not known, no presumption can arise as to the true state of the goods at the time of the shipment. How can the master be presumed to agree, that the goods are shipped in good order and condition, when he is utterly ignorant what they are, and what is their nature, and what is the state, in which they are? It is true, that the bill of lading states that the·contents are bacon; but the master does not admit the fact to be so. He says he knows not the contents of the hogsheads, and therefore he can speak only to the external character of the hogsheads, which might be properly fit for one description of goods, and not for another. The evidence shows that these were western hams, which came from Cincinnati to New Orleans. When they came, how long they had been at New Orleans, and what was their condition, when shipped at New Orleans for Boston, are facts not proved by any clear and determinate evidence. That they were in very good order when shipped at Cincinnati is proved; but it is

quite consistent with this fact, that, before they were put on board of the Rolla, they may have suffered all the deterioration and leakage, which were found to exist at Boston. Indeed, the evidence of the persons in Boston, who received them for smoking at Boston, is that they were in as good condition as the average of other shipments of western hams coming to Boston by the way of New Orleans. What I put the case upon in respect to damage is, that the evidence goes no further than this, that there might have been a probable damage from the goods being brought on deck, not that in this case there positively was such a damage. Now, under all the circumstances, my mind is left in great doubt on the point; and such a doubt alone is sufficient, under such circumstances, to repel the claim.

As to the other point, I am very clear, that the libellant is entitled to no more than the deck freight. His contract was, that he would carry the goods under deck for the full freight. He has not performed his contract, as he stipulated. But he seeks to recover the same freight. as if he had punctiliously performed it. His argument is, the hogsheads arrived safe, and without damage, and therefore I am entitled to a full compensation. By carrying the goods on deck I took upon myself the additional responsibility of the additional chance of loss to the goods. To this argument the true answer is, that by so doing he has violated the terms of his contract. He has thrown additional risks on the shipper beyond what he knew or intended. If the shipper had procured insurance on the goods, it would have been utterly lost. If he had none he is compelled to stand his own underwriter. without his own consent, under circumstances, which greatly enhanced the perils of the voyage. He is compelled to rely on the responsibility of the master and owner in a case where he has not trusted them; and his election to .seek security from other underwriters is taken away, not only without his knowledge, but against his positive stipulation. At the common law we all know, that ordinarily no man can recover upon a contract who by his own default has not performed its stipulations; unless, indeed, the other party waives his rights. In the court of admiralty, which in this respect acts as a court of equity, the contract is not so rigidly construed or enforced. The compensation is apportioned, according to the nature and extent of the default of the party. I think, I am not only warranted, but bound by the doctrines of courts of admiralty on this point to say, that the libellant is not entitled to a higher compensation than the ordinary deck freight of five-eighths of the full freight. This is dealing out to him a liberal compensation in a case, in which there has been a gross departure from duty. Sound policy dictates. that neither the master nor the owner should here derive any advantage from their departure from duty; and that they should not be tempted to put the property of shippers at risk beyond the con-

templated arrangements, by becoming, as it were, insurers, without the consent of the shippers. The decree must be reformed accordingly; but no costs are to be allowed to either party in this court. But the libellant is to have the costs in the district court.